234 So.2d 606 (1970)
J.C. WILBOURN
v.
Mrs. Lorain B. HARDIN.
No. 45745.
Supreme Court of Mississippi.
April 20, 1970.
Rehearing Denied May 18, 1970.
Snow, Covington, Temple & Watts, Meridian, for appellant.
Billy R. Covington, Meridian, for appellee.
JONES, Justice:
Appellant suffered a judgment in the Circuit Court of Lauderdale County when sued by appellee for the destruction of her car by the falling of a brick wall.
We are reversing and dismissing.
The facts giving rise to the action cover a period of four years.
In April 1964, appellant acquired title to a store building at the southwest corner of *607 Front Street and 22nd Avenue in Meridian. Immediately west was a mercantile building which was later destroyed by fire. The corner building was also damaged.
Soon after acquisition of the corner building, appellant purchased the property immediately west, which was then vacant, except for debris left from the fire.
Each of the two buildings had a separate wall, there being no common wall.
Appellant arranged with L.B. Priester & Son to repair the corner building and convert the west property into a parking lot. L.B. Priester, Jr., president of the company, held a degree in engineering, was registered as a practicing civil engineer in Mississippi and North Carolina, and had been in the construction business forty-four years.
The conversion of the west property involved removing the rubble and repairing the east wall, which was next to the west wall of the corner building.
This work by Priester was completed in June 1964.
On April 14, 1965, appellant leased the corner building and parking lot to McRae & Company for ten years, and McRae took possession.
Appellee, employed by McRae, used the parking lot to store her car while working. Appellee charged in her declaration, and it was shown by the evidence, that on or about May 13, 1968, there occurred a rain with accompanying winds, and that said wall collapsed.
The evidence showed that such winds were violent, and it was testified to, and undisputed, that winds do not have to blow against a wall so as to push it forward; but that in a place, such as the parking lot, with walls on the east and west side, suction created by the wind might pull the wall the other way.
The lease to McRae contained this provision:
The Lessee accepts the building and all fixtures and equipment located therein in the condition that the same [sic] now are and is granted permission to remodel. * * *
* * * * * *
The Lessee shall during the period of this lease at its own expense maintain such building and all fixtures and equipment necessary to its business and make such repairs from time to time as may be necessary with the exception that Lessor will at its own expense maintain and make any repairs that may be necessary to the roof of said three-story brick building and will also maintain and repair any structural deficiency in the outside walls of said building. * * *
This was a general agreement to repair, rather than an obligation to make specific repairs.
In an effort to establish her case, basing same on negligence, appellee traveled backwards for a period of four years (during which the wall had stood) to the time when Priester was removing trash and repairing the wall.
Appellee apparently relies upon two items of evidence to establish liability against appellant.
The first was that Priester employed one Shumate, also engaged in the construction business, to tear down what was necessary of the wall in question. He was to leave the wall standing about 22 to 24 feet high; and Priester was to tell him when to stop.
He said that when he called Priester, to ascertain whether or not he should stop, his men directed his attention to the fact that the wall was loose and would rock when pulled by hand. He said the wall was old and rotten and that "it was not safe to leave standing as it was." He did not examine the foundation. Neither did he check to see if the wall was plumb.
When he reported to Priester, he was advised by him that he was going to repair the wall "to make it safe." The witness *608 did not remember that Priester agreed with him, saying, "The only thing he told me is said, `We are going to repair the wall and it will be all right. Just forget it and go on and finish my work.'" It was never reported to any city inspector. He never mentioned the matter to Mr. Priester except that one time. Although the witness claimed he knew some things that Priester did not do in making the wall safe, he could not say what Priester did do.
Mr. Priester testified that the uppermost part of the wall was buckled and loose and that he tore it down below any evidence of looseness and five feet below that to get a good solid wall, roof high, for a two-story building to be built later. The original building was three stories high. Priester said that he did not leave an unsafe wall, and told what he did.
Appellee argues appellant had economics in mind when deciding not to tear all of the wall down. The proof shows that the reason part of the wall was left was so it might be used, should the parking lot be covered, or another building erected to the height of two stories.
The other event relied on was the testimony by appellee that she heard Priester say to Gibson Witherspoon that he had told appellant the whole wall should be razed when she and Witherspoon, who did not testify, were at the scene. Priester said he did say this, but it was after the wall fell and that he was speaking of the wall as it then was, after the collapse. This statement of Priester's was not denied, and it is reasonable to presume that it was made about the portion of the wall remaining after the fall. Presumably, appellee and Mr. Witherspoon were checking for appellee on her loss. There is no proof that appellee was in or near the parking lot while it was being cleared four years prior.
Before the lease was executed, appellant went with McRae, representing the lessee, to look at the property. They went on the parking lot and saw the wall and surroundings. No effort was made by appellant to conceal anything.
The lessee had the opportunity to check and examine the wall and all the property. The wall actually stood for four years without trouble, and fell only during a violent windstorm.
The first Mississippi case where a suit against the landlord for damages for failure to maintain the property was considered was in 1893 and is reported as Jones v. Millsaps, 71 Miss. 10, 14 So. 440 (1893), where it was said:
The general rule is firmly established that no implied covenant for repairs can be raised against the lessor. The lessee cannot invoke an implied covenant of the landlord that the leased premises are fit and suitable for the lessee's business or use. The intending tenant must use his own faculties, and judge for himself if the premises he desires to lease are in repair, and are suitable for his use. If he wishes to protect himself against the hazards of subsequently occurring accidents or defects requiring repairs, he must do so by proper covenants in his contract of lease. He takes his leased premises for better or for worse, as an ancient authority aptly characterizes his taking. He takes the premises as he finds them, and he must return them, as nearly as possible, in like condition. This necessarily involves his making repairs on the property during the term of his lease; and all this must be true  all this is true  whether he lease one room or six, the whole or a part of the house. If he rents the whole, the wisdom and necessity of his protecting himself in his contract by stipulating for repairs by his landlord appears to be not less, but greater, than if he rents a part, only. The rule extends to the whole premises, and to every part of the premises. The duty of the tenant to examine the premises, and protect himself by proper stipulations in his contract of lease, if danger is suggested by his examination, is the same in case of the leasing of a whole or of a part, only. He *609 cannot fix liability upon his lessor by some supposed implied covenant to repair, when he had it in his power to create this covenant expressly in the written contract, and failed to do so. (71 Miss. at 18, 19, 14 So. at 441).
The next case was Rich v. Swalm, 161 Miss. 505, 137 So. 325 (1931), where the Court there wrote:
There is the notion generally prevailing in the popular mind that a landlord occupies a position similar to that of a master, and that, as the master must furnish his servant with a safe place to work, so must the landlord furnish his tenant with a safe place to live, or else the notion is that the landlord is in a position of superiority, and that the general principles of respondent superior should apply. But, in the absence of statute, the rule of law is universal that a simple lease of a dwelling or other private premises carries no obligation whatever upon the landlord to repair, if there be no deceit or misrepresentation, or the equivalent thereof, by the landlord. The lessee takes the premises as he finds them, and he must return them as nearly as possible in like condition. Jones v. Millsaps, 71 Miss. 10, 14 So. 440, 23 L.R.A. 155. Or as has been expressed in a discriminating annotation on this subject, 8 A.L.R. 766: "Where the right of possession and enjoyment of the leased premises passes to the lessee, the cases are practically agreed that, in the absence of concealment or fraud by the landlord as to some defect in the premises, known to him and unknown to the tenant, the rule of caveat emptor applies, and the tenant takes the premises in whatever condition they may be in. * * * This doctrine is in harmony with the common-law rule that a lease is a conveyance of an estate or an interest in real property, or a transfer of the right to the possession and enjoyment of real property for a specified period of time, or at will. In other words, it is a demise of real property for a limited period of time. So far as concerns the condition of the premises, the relation created by a lease is substantially similar to that created by a deed or a contract for the sale of real property with the right of possession."
There being, therefore, no obligation on the part of the landlord to repair as a result of a simple lease of the premises, the mere fact that he remains the owner of the remainder of the estate, less that granted by the lease, imposing upon him no greater obligations in respect to repairs than if that estate were the property of a stranger to the contract of lease, then it must follow as a logical consequence that, when the landlord makes a contract to repair the premises, his obligations under said contract to repair are no greater than, nor anything different from, the obligations that would be incumbent upon a stranger or independent contractor who had contracted to make the repairs, and the liability for a failure to execute the contract would be exactly the same as that which a stranger-contractor would incur. The obligation would therefore be one not at all imposed by law, but would be purely contractual, and the liability for nonperformance would be, not upon negligence or in tort, but upon breach of contract. (161 Miss. 515-517, 137 So. 326-327).
In 1955 there was decided Ford v. Pythian Bondholders Protective Committee, 223 Miss. 630, 78 So.2d 743 (1955).
Ford occupied for business purposes a room rented by his employer. He was injured when a part of the glass in a window fell while he was trying to raise the sash. It was alleged that part of the sash of the window was rotten, causing the glass to fall; that there were hidden defects not known to appellant against whom the jury had found; and that appellees negligently failed to warn appellant.
*610 The lease contained these provisions:
"The lessee hereby agrees with the lessor as follows:
"* * *
"2. To make no repairs or alterations on the premises without the written consent of the lessor.
"* * *
"5. To permit the lessor to enter and inspect the premises and make such repairs as may be deemed necessary by him.
"Minor surface repairs within space demised exclusively to lessee to be done by lessee; other repairs and changes, as required, to be done by lessor. Landlord shall make whatever structural changes, structural repairs, or repairs for structural defects as may be required." (223 Miss. at 637-638, 78 So.2d at 745).
Appellee denied any privity of contract or any concealment. It was appellant's contention that:
[T]he principles of law that should be applied to the facts in this case are the principles set forth in American Law Institute's Restatement of the Law of Torts, Vol. 2, Sections 357 and 362, which are as follows:
"Section 357. A lessor of land is subject to liability for bodily harm caused to his lessee and others upon the land with the consent of the lessee or his sublessee by a condition of disrepair existing before or arising after the lessee has taken possession, if (a) the lessor, as such, has agreed by a covenant in the lease or otherwise, to keep the land in repair, and (b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented. * * *"
"Section 362. A lessor of land, who by purporting to make repairs thereon while the land is in the possession of the lessee or by the negligent manner in which he has made such repairs has, as the lessee neither knows nor should know, made the land more dangerous for use, is subject to liability for bodily harm caused thereby to the lessee and others upon the land with the consent of the lessee or a sublessee. * * *"
It is admitted that this Court has not adopted the principles of law as set forth in the A.L.I. Restatement. But it is insisted that the Court should adopt those principles, which represent the more modern view of the landlord's duty to make repairs and the landlord's liability for a failure to keep the leased premises in a proper state of repairs. (223 Miss. at 641-642, 78 So.2d at 747).
This Court refused to adopt such rules and quoted with approval from 32 Am.Jur. Landlord and Tenant section 723, pages 597-598 (1937):
"While the authorities are not entirely agreed as to the effect of a landlord's covenant to repair with regard to his liability for personal injuries to a tenant and his invitees, according to the great weight of authority, a landlord's breach of his covenant to repair the demised premises or to keep the premises in repair, in consequence of which the tenant or those in privity with him receive personal injuries, does not give rise to a cause of action, either ex delicto or ex contractu, in favor of the injured person against the landlord for damages or indemnity for the injuries thus caused, unless it appears that at the time of the demise the premises contained, to the landlord's knowledge, dangerous hidden defects unknown to or concealed from the tenant, which the tenant could not have discovered by reasonable inspection.
* * * It is the rule in most jurisdictions that in covenanting to repair the leased premises, the parties do not contemplate that if the premises become defective through the landlord's failure to comply with his covenant, an accident to the tenant or to someone in privity with him will be the probable result of the breach, and hence damages for such an injury are not to be included in asserting the damages in an action for damages *611 for breach of the covenant to repair." (223 Miss. at 642-643, 78 So.2d at 747).
It then cited and quoted with approval from Jones v. Millsaps, supra, and Rich v. Swalm, supra, after which it was held:
It thus appears that under our own decisions a landlord's breach of his covenant to repair generally the demised premises (as distinguished from an agreement to make specific repairs) does not render him liable for damages for personal injuries to the tenant or one in privity with him, unless it appears that at the time of the demise the premises contained, to the landlord's knowledge, dangerous hidden defects unknown to or concealed from the tenant, which the tenant could not have discovered by a reasonable inspection.
The duties and liabilities of the landlord to the employee of the tenant with respect to personal injuries ordinarily are the same as those owed by the landlord to the tenant. 52 C.J.S., Landlord and Tenant, § 421, page 71, (223 Miss. at 645, 78 So.2d at 749).
In Ford, supra, it was shown that when the windows were repaired, tin was placed on the sash which concealed the defective condition. The Court stated:
At best, the appellant's proof tended to show that his injuries resulted, not from some act of negligence or unskillfulness in making repairs, but from the appellees' failure to keep the premises in safe condition by making other repairs that were needed. And for that failure the appellees cannot be held liable in a case of this kind under the rule laid down in Rich v. Swalm, supra. (223 Miss. at 648, 78 So.2d at 750).
This window was repaired after March 1951. The appellant was injured September 4, 1951, a period of six months as compared with four years. The case was affirmed as the law of this State.
Floyd v. Lusk, 190 So.2d 451 (Miss. 1966) followed Ford. The heading of this case is:
Action against landlord for personal injuries. The Circuit Court, Sunflower County, Arthur D. Clark, Jr., J., rendered judgment notwithstanding verdict for lessor and appeal was taken. The Supreme Court, Rodgers, J., held that in absence of evidence that lessor had created nuisance calculated to cause damage or injury, or was guilty of willful wrong or culpable negligence or concealment or fraud as to some defect on premises, lessor was not liable to plaintiff who was injured when she stepped and fell on defective steps of store building which was being leased by tenant at time of the injury.
There is no more than a scintilla of evidence, if that, to show any concealment or fraud on the part of appellant; and, therefore, the case is reversed and judgment here for appellant.
Reversed and judgment here for appellant.
ETHRIDGE, C.J., and RODGERS, PATTERSON, and SMITH, JJ., concur.